# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| SHERRILYN KENYON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 3:16-cv-0191 |
| | ) | District Judge Crenshaw |
| CASSANDRA CLARE, a/k/a JUDITH | ) | Magistrate Judge Knowles |
| RUMELT, a/k/a JUDITH LEWIS | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DOES 1 through 50, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |

_____

## DEFENDANT CASSANDRA CLARE'S MEMORANDUM IN SUPPORT
## OF MOTION TO DISMISS
_____

Defendant Cassandra Clare ("Clare") respectfully submits this memorandum in support of her motion, pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6), to dismiss the First Amended Complaint ("FAC") of Plaintiff Sherrilyn Kenyon ("Kenyon") (ECF Doc. No. 30) in its entirety.

## I.      INTRODUCTION

At least **seven years** after learning of Clare's wildly successful "Shadowhunters" books for children and young adults, Kenyon filed suit in this Court (despite its lack of jurisdiction over Clare) claiming that Clare had "willfully" copied Kenyon's very-adult romance novels and infringed upon Kenyon's trademark, "Dark-Hunter."

Kenyon's claims are legally baseless—she pleads too little and, after seven years, literally too late as a matter of law. Kenyon did not even attempt to answer Clare's initial motion to dismiss the initial Complaint (ECF Doc. No. 1).  Instead, she abandoned **all** of her copyright claims despite the vehemence with which she had originally asserted them (inferentially, for media

consumption).[1] Kenyon persists, however, in pursuing via the FAC five Lanham Act claims and a newly added common-law unfair competition claim (collectively, the "Trademark Claims").

The Trademark Claims in the FAC are no different—and no less subject to dismissal—than those in the initial Complaint. Kenyon lards the FAC with sensationalized factual allegations, but they do nothing to impart legal merit to her claims. One of Kenyon's most outlandish counterfactuals is that Clare personally conspired with her publisher to intentionally print Kenyon's "Dark-Hunter" on the back cover of one of Clare's own books, *City of Bones,* during its thirteenth printing in 2009. (FAC ¶ 30, 54, 89.)

As detailed below, this allegation is not only false—Clare's publisher (who then and now is a publisher of Kenyon's)[2] told Clare ***and*** Kenyon in writing that it was the printer who was responsible for the mistake—revealing the FAC in this respect (among others) to be patently false. *See, e.g.*, contemporaneous e-mails annexed as Exhibit A to the accompanying Declaration of Cassandra Clare ("Clare Decl.").[3] The publisher privately apologized to Clare and, of course, Kenyon; indeed, the Publisher even offered to send a written apology to both Kenyon ***and Clare*** that Kenyon could share with her fanbase. However, Kenyon, who had engaged a large law firm at the time to address the matter, ultimately thought so little of the printer's mistake that she (a) chose not to bring the lawsuit that she has now filed (years too late), and (b) never even took the publisher up on its offer to issue a written apology to Kenyon and Clare. Clare herself forgave the Publisher its mistake without demanding a public *mea culpa*, but did receive an indemnification from the Publisher in light of Kenyon's having brought in legal counsel to handle the matter.

---

[1] Although Kenyon has abandoned all of her copyright claims, the FAC continues to make some of the same false accusations underlying those claims. (*See, e.g.*, FAC ¶¶ 44-45.) The reasons that these accusations are false were detailed in Clare's Motion to Dismiss and will not be addressed since Kenyon no longer seeks judicial relief for them.

[2] Simon & Schuster was Clare's publisher; Kenyon was published by one of its divisions "Pocket Books." (Ex. A.) In this brief, we refer to Simon & Schuster as the "Publisher."

Kenyon and her legal counsel did nothing then and, as summarized briefly below, can do nothing now.

- **Kenyon Has Not Established that the Court Has Personal Jurisdiction Over Clare.** Clare is a Massachusetts resident who has not has not travelled to Tennessee during the times and for the purposes alleged in the FAC, which are vague and unsupported with factual detail.

- **The Trademark Claims are Time-Barred.** The application of the doctrine of laches by federal courts for such claims is well-established. The law requires consideration of two factors: (i) unreasonable delay by the plaintiff and (ii) material prejudice to the defendant. Both are established in this case. Kenyon has known of Clare's use of "Shadowhunters" for 10 years and done nothing despite having engaged legal counsel in 2009, seven years ago. That such a delay is so unreasonable is beyond any good faith argument. Likewise, after the publication of numerous books, a major film, a television series, and other uses of "Shadowhunters" without complaint by Kenyon, the prejudice to Clare is also beyond contradiction.

- **As a Matter of Law, there is No Trademark Confusion.** Where the source of a product is plainly identified as coming from a defendant rather than a plaintiff, no claim of confusion is sustainable. Sample book-covers images included attached as Exhibit O to the Motion confirm that point better than words. As is plain from those images, the fact that Clare's latest book (No. 1 on *The New York Times* Young Adult Hardcover List for 14 weeks as of this writing) is the work of Cassandra Clare and not Kenyon is beyond dispute. Clare's name is higher, larger and brighter than any reference to the fact that is "A Shadowhunters Novel" and there is no reference to Kenyon or her trademarked "Dark-Hunter." Likewise, Kenyon's books are emblazoned with her

---

[3] Exhibits A-C and N are attached to the Clare Declaration. Exhibits D-M and O are attached directly to the Motion.

3

name far more prominently than her "Dark-Hunter" reference above even the title."[4] In any event, Kenyon has no right as a matter of law or common sense to a monopoly on the word-suffix "hunter." The wide-spread use of "hunter" in popular culture renders Kenyon's claim as impractical (and legally impossible) as if she claimed it such a right for "dark." Likewise, "Shadowhunters" and "Dark-Hunter" are not confusingly similar within the scope of applicable law merely because they contain the ubiquitous word "hunter."

## II.     RELEVANT FACTUAL BACKGROUND

### A.     Allegations Concerning Personal Jurisdiction

Clare, a Massachusetts resident, is the only named defendant. The Complaint nominally includes 50 Doe defendants, which clearly include the publisher of Clare's books (the "Publisher"), and the corporate parties that created, produced, distributed and aired the movie and television series derived from Clare's literary works. The allegations in the FAC concerning personal jurisdiction are contained in ¶ 5 and are divisible into three parts.

The first alleges that "CLARE has, among other acts, entered into contracts with Tennessee vendors for the promotion of her infringing works, has personally travelled to Tennessee to promote the sale of her infringing works, and has directly promoted the sale of her infringing works to Tennessee residents through electronic communication." (FAC ¶ 5.) This allegation is totally devoid of facts about the purported "contracts with Tennessee vendors," "personal travel[] to Tennessee" and "direct promot[ion]." Moreover, as Clare states in her Declaration, at ¶¶ 2-3, she has engaged in no such activity during the relevant timeframe: on or after February 5, 2013. Accordingly, the allegations are unsupportable.

---

[4] That Kenyon is mostly known for writing erotic "Romance" novels for adults while Clare writes exclusively for young adults makes confusion even less likely. Kenyon did not publish her first book for young adults until 2011, *after* Clare had become a famous, consistent bestseller in that genre. Kenyon has not appeared on THE NEW YORK TIMES bestseller list in more than three years.

4

The second part alleges that upon information and belief, "CLARE and the DOE DEFENDANTS have also entered into contracts, either directly or through her/their representatives, that require CLARE's infringing works be sold or distributed in Tennessee." (FAC ¶ 5.) This is demonstrably false, at least with respect to contracts Clare to which is a party. The sole contract she signed concerning movie and television rights. (Clare Decl., Ex. B (extraneous provisions redacted)) gives the "Purchaser"[5] the right, but not the obligation, to exercise its option to exploit the rights granted by Clare—if it does so the relevant territory is "throughout the universe." (*Id.* § 4.) Section 4(g) states explicitly that "[n]othing contained in this Agreement shall be construed as requiring Purchaser to exercise or exploit, or continue to exercise or exploit, any of the rights herein granted." The contracts with the Publisher (Clare Decl., Ex. C (extraneous provisions redacted)) gives the Publisher the right, but not the obligation to distribute books in the United States (including territories), Canada and the Philippines. In fact, the contracts make clear (at § 12(b)) that "[f]inal decisions as to format, style of printing and binding, title, cover presentation, trade name, trademark, logo, imprint or other identification, and retail price and all other matters of sale, distribution, advertising and promotion of each Work shall be within Publisher's sole discretion."[6]

Third and finally, the FAC (at ¶ 5) alleges that "CLARE's website (www.shadowhunters.com) is highly interactive and allows residents of Tennessee to sign up for an 'author alerts' mailing list whereby they can learn of new releases, get recommendations, special offers, and a free eBook." Kenyon's blithe assertion that www.shadowhunters.com is

---

[5] The original "Purchaser" was Warner Bros. Pictures, which subsequently exercised its unilateral right to assign the contract (Ex. B § 9) to Constantin Film AG ("Constantin").

[6] The form, but not the substance, of this provision was altered in the final two contracts. They simply provide (at § 3(e)) that "S&S shall advertise, promote and market the Work in accordance with S&S's reasonable business judgment."

5

"CLARE's website" is as demonstrably false as the other allegations. The homepage (Motion, Ex. M) directs viewers to "Simon & Schuster's Children's Privacy Policy" and the terms of the Policy itself state clearly that "[t]his Children's Privacy Policy only applies to the websites or webpages operated by Simon & Schuster, Inc. or one of its subsidiary or affiliated companies (collectively, "S&S") that post this Children's Privacy Policy."

**B.     Allegations Concerning Trademark Claims**

> **1.     *The 2009 Misprint***

In 2009, some copies of Clare's book *City of Bones* mistakenly contained, because of a printer's error, the word "Darkhunters" on the back cover. The FAC (at ¶ 33) acknowledges that the Publisher recognized its mistake and destroyed all of the warehoused copies with the misprint. Because Tennessee federal courts apply a three-year statute of limitations by analogy to Lanham Act claims (*see infra* at p. 16-18), the first claim in the FAC, which relates solely to that incident, is so clearly time-barred that its inclusion at least borders on being frivolous.[7]

The gist of the claim is that Clare conspired with her the Publisher (which, via a paperback subdivision "Pocket Books," also published Kenyon's books) in 2009 to brand the thirteenth printing of one her books with "Darkhunters." According to Kenyon's risibly self-aggrandizing false statements, Clare's entire career as a successful author is attributable to that printer's error even though there have been no misprints since then. *See, e.g.,* FAC ¶ 38 ("Indeed, CLARE's works did not receive significant recognition until after her Shadowhunter Book was mislabeled.").

On April 24, 2009, Clare received an e-mail from the Publisher informing Clare about the misprint and apologizing profusely for the "mistake—and where the hell did it come from??" (Ex.

A.) She then reported that the "person in charge of reprints" had been fired, "as too much was going wrong under her watch." *Id*. The Publisher noted that "[s]ince we also publish Sherrilyn Kenyon, at Pocket, her editor there has been in touch with Sherrilyn and her agent" and further reiterated to Clare "that we are so, so sorry ever to have had this happen."

The FAC implies falsely that *City of Bones* was a new release at the time of the misprint. It was not. It was released over two years earlier, on or about March 27, 2007, and had sold more than 95,000 copies by the end of 2008; *i.e.*, before the mistaken printing. (Clare Decl. ¶ 7 and Ex. D.) Moreover, Clare had released the next book in the series, *City of Ashes*, on or about April 1, 2008. Sales of that book, which never contained any misprints on the back cover at any time, were also in the tens of thousands by the end of 2008.[8] (Ex. E.)

Between the release of *City of Ashes* and the expected release of the third book in the series, *City of Glass*, on or about March 24, 2009, Stephenie Meyer, the author of the hugely successful *Twilight* series, had generously offered to let Clare use her name on the book covers along with her quote that the series created "a story world I want to live in." (Clare Decl. ¶ 6.) The desire to include that information on new reprints of *City of Bones* was in fact the cause of the cover redesign. (*Id.*)

By July 7, 2009, after separate discussions with Kenyon (and her representatives) and Clare (and her representatives), the Publisher had composed a joint apology to both:

Dear Sherrilyn Kenyon and Cassandra Clare:

It recently came to our attention that there was a misprint in the back cover text of some units of the paperback edition of *City of Bones*, by Cassandra Clare. On the affected units, the term "Darkhunters" was used to describe the novel's secret band of warriors dedicated

---

[7] As a side note, the claim includes a bizarre demand for a permanent injunction. It is unclear what the Publisher (let alone Clare) could be enjoined from doing. There is no allegation that it has any of the misprinted books in its possession, custody or control.

[8] Kenyon does not dispute that even the copies of *City of Bones* with the misprint on the back cover includes the correct title and author (Cassandra Clare) on the front cover.

7

to ridding the earth of demons. The correct term is Shadowhunters," which is the term used in the book and throughout Ms. Clare's Mortal Instruments series, of which *City of Bones* is a part. We apologize to you both for the misprint error, and we stress that Ms. Clare was not in any way responsible for the misprint. Simon & Schuster has corrected the error in the most recent printings of *City of Bones.*

As many readers are aware, Dark-Hunter® is the name of a successful series of novels by - and a registered trademark of—Sherrilyn Kenyon. *City of Bones* is not associated or affiliated in any way with the Dark-Hunter series or Ms. Kenyon.

Sincerely yours,

Jon Anderson.

(Ex. A.) The Publisher sent the text of the proposed letter to Kenyon's attorney at that time, Tiffany Dunn of Loeb & Loeb in Nashville. (*Id*). On July 29, 2009, Clare's representatives followed up with the Publisher's in-house counsel to find out the status of the letter. She said that they "had never sent it because – amazingly enough – I never heard back from Tiffany Dunn after I sent her the email with the language such a letter would include." (*Id.*) That was the last Clare or her representatives heard about the matter until the commencement of this action in February 2016. (Clare Decl. ¶ 11.) Whatever the reasons for Kenyon's failure to act, she knew then, and still knows, that the misprint was a mistake for which Clare was ***not*** "in any way responsible" and that the Publisher took significant steps to ameliorate it.

Even with respect to the misprint, the FAC nowhere alleges actual confusion. It refers to "substantial consumer confusion" (FAC ¶ 37), a term that has no meaning in trademark law, and appears to be Kenyon's own creation. In any event, the only factual allegation is a single purported e-mail concerning the misprint, which does not even assert that the writer of the e-mail purchased the misprinted *City of Bones*. (FAC ¶ 36.)

### 2. *The Use of "Hunter" as an Element of a Tradename*

Apart from the first claim in the FAC, addressed in the previous section, all of Kenyon's Trademark Claims are premised on the contention that she has a trademark monopoly on the use of

"Hunter," at least in the field of creative works with supernatural themes. As discussed below (pp. 20-23), Kenyon is legally barred from the exclusive right to such a broadly-used descriptive (if not generic) term. As a factual matter, its use is ubiquitous.

Exhibit F to the Motion is a list of recent uses of the term in audiovisual and literary works dealing with supernatural themes. Not including the works at issue in this case, there are at least 28 audiovisual works since the 1980s that incorporate "Hunter" in their titles. These include a movie titled *Darkhunters* from 2004 and *The Dark Hunter* from 2003. The plot summary for the former on the comprehensive database IMDb.com (Ex. G) includes the statement that "Darkhunters creates a world of demons and angels that will take you beyond your imagination." (Compare FAC ¶ 44 ("The Dark-Hunter Series follows an elite cadre of warriors who fight to protect mankind from demons and others who prey on humans").) There is also a movie titled *Shadowhunter* that is unrelated to any of the parties in this action. Likewise, there are at least 39 titles of books or book series that use "Hunter." Kenyon has tolerated all of these uses, just as she tolerated the use of "Shadowhunters" here until February 5, 2016.[9]

### 3. *The Use of Shadowhunters as a de facto Trademark*

In an obvious gambit to avoid dismissal based on laches (*see infra* at pp 17-18). Kenyon now claims in the FAC (¶ 19) that until "recently" (without stating what she means by "recently") "Shadowhunters" was not used as a trademark. Assuming that she means that the use began less than three years prior to the commencement of this action, she is demonstrably incorrect. It is clear that Clare's books used the term as a branding tool (as opposed to simply using the term as a

---

[9] Paragraph 46 of the FAC alleges in passing fashion that "CLARE's works also include references to 'Dark Shadowhunters.'" In contrast to "Shadowhunters," however, there is no allegation concerning how often and in what context this phrase was used, let alone that it was used as a trademark or branding device. Even if it is assumed for the sake of argument that Kenyon has a trademark monopoly on "Dark Shadowhunters," it is only being used "in a 'non-trademark' way—that is, in a way that does not identify the source of a product—then trademark infringement and false designation of origin laws do not apply." *Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 695 (6th Cir. 2003).

9

description in the text), as early as 2007. Thus, Clare's FAQ page from July *2007* had the following:

> Q: Are you going to write more Shadowhunter books after City of Glass?

> A: I'm not going to write more books about Clary and her friends, because their story ends with City of Glass. But I do want to write more about the Shadowhunters and their world.

*See* Ex. H (FAQ dated July 2007 from [www.cassandraclare.com](http://www.cassandraclare.com) (accessible at [https://web.archive.org/web/20070701213759/http://cassandraclare.com/faq.html)](https://web.archive.org/web/20070701213759/http://cassandraclare.com/faq.html))).

Additional examples of such use (all in Ex. H, arranged chronologically), include:

- June 1, 2007: Posting of cover images of the new U.K. edition of *City of Bones*, the back cover of which provides that "Clary realizes that she has stumbled into an invisible war between ancient demonic forces and the secretive Shadowhunters – a war in which she has a fateful role to play . . ." [accessible at [http://thegraybook.livejournal.com/215652.html](http://thegraybook.livejournal.com/215652.html).]

- "23 June 2008 @ 06:52 pm
  New Shadowhunters series!

         *      *      *

  I always knew I'd be done with Clary's story after *City of Glass*, but I wasn't done with the world of Shadowhunters and Downworlders. I wanted to do more in that world, with that mythology. On the other hand, I also always wanted to write a historical fantasy novel set in Victorian England, preferably with steampunk elements. At some point, I decided to combine the two — to write about Shadowhunters in a different city than New York, and a different time than now — a time before the Accords, when things between Shadowhunters and Downworlders were considerably less peaceful, and the Shadowhunters lacked some of the technology they employ today." [accessible at [http://thegraybook.livejournal.com/228276.html](http://thegraybook.livejournal.com/228276.html).]

- July 8, 2009 (e-mail from Cassandra Clare to fans at [Cassandra_Clare@googlegroups.com](mailto:Cassandra_Clare@googlegroups.com)): Informing fans of forthcoming event in New York City "where I will be signing books, answering questions, and making some Very Special Announcements about the future of the Shadowhunters books, what's up next, and sharing some (I think) fairly awesome news."

- January 27, 2010: Posting of cover images of the new Italian editions of *City of Bones, City of Ashes* and *City of Glass* with *Shadowhunters* clearly displayed as the common title element. [accessible at [http://cassandraclare.livejournal.com/34560.html](http://cassandraclare.livejournal.com/34560.html).]

10

- February 22, 2010: e-mail from Annalie Granger (of Clare's U.K. publisher, Walker Books Ltd.) to Clare: "The sales reps were all very excited at the prospect of a brand-new Shadowhunters series to sell in and everyone loved the cover."

- September 26, 2011: Display of on Clare's tumblr.com page SHADOWHUNTERS in large type as the common branding element of *The Mortal Instruments* and *The Infernal Devices* series. [accessible at https://web.archive.org/web/20110926103419/http:/cassandraclare.tumblr.com.]

- June 19, 2012: Article on examiner.com titled "'Shadowhunters Chronicles' round-up." [accessible at http://www.examiner.com/article/shadowhunterchroniclesroundup.]

Moreover, the FAC itself thoroughly discredits its own conclusory contention that the use of Shadowhunters as a branding term is "recent." The allegations concerning the 2009 misprint accuse Clare and the Publisher on numerous occasions of engaging in deliberate "misbranding" at that time. (*See, e.g.,* FAC ¶ 38 ("In 2009, following the misbranding, CLARE's 'store events' began to change.").) There is no dispute that the misprint was the substitution of "Darkhunters" on the back cover of the book where "Shadowhunters" had been and was supposed to continue being. Kenyon's arguments about the 2009 incident, therefore, are necessarily premised on the factual allegation that there was "misbranding," meaning the wrongful substitution of the "Shadowhunters" brand with the "Darkhunters" brand.

The relevant covers of the books in question demonstrate this conclusively. The tenth printing of the back cover of the paperback edition of *City of Bones* contains text with two prominent references to "Shadowhunters." (Ex. I.) The first states that "the murderers explain themselves [to Clary] as Shadowhunters: a secret tribe of warriors dedicated to ridding the earth of demons." The second asks "[a]nd how did Clary suddenly get the Sight? The Shadowhunters would like to know . . ." The front cover of the 2009 thirteenth printing—the first one containing the misprint on the back (Ex. J) differs from the tenth only in that it includes the referenced quote from Stephenie Meyer. The misprint is apparent in that the references to "Shadowhunters" are replaced by references to "Darkhunters." The first is "[t]his is Clary's first meeting with the

11

Darkhunters, warriors dedicated to ridding the world of demons—and keeping the odd werewolves and vampires in line." The second asks "[a]nd how did Clary suddenly get the Sight? The Darkhunters would like to know . . ." Clearly, therefore, the mistaken substitution of the mark "Darkhunters" for the intended "Shadowhunters" mark.

A review of the back cover of a 2009 printing of the next book, *City of Ashes* (Ex. K) shows the continued use of Shadowhunters as a branding device: (1) "Clary Fray and her fellow Shadowhunters have a strong suspicion that Valentine, Clary's father, may be behind the killings." (2) "No one said that the life of a Shadowhunter would be easy." The succeeding book, *City of Glass*, intensifies that use, as the back cover of a 2010 printing demonstrates. (Ex. L.) It refers to "Shadowhunters" explicitly three times in the narrative text and, further, invites readers to "find out what the Shadowhunters are up to next at theinfernaldevices.com." These facts further rebut the claim that the use of "Shadowhunters" as a branding device is only "recent."

## III.  ARGUMENT

### A.  This Court Lacks Personal Jurisdiction Over Clare.

Plaintiff has failed to sufficient plead for a second time that personal jurisdiction exists over Clare. Therefore, the Amended Complaint must be dismissed pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.

A plaintiff has the burden of establishing that the court has jurisdiction over the defendant. *Neogen Corp. v. Neo Gen Screening, Inc.*, 262 F.3d 883, 887 (6th Cir. 2002). Where, as here, the plaintiff is invoking the exercise of long-arm jurisdiction over a defendant who indisputably resides elsewhere, the complaint must make a *prima facie* showing "by 'establishing with reasonable particularity sufficient contacts between [the defendant] and the forum state to support jurisdiction.'" *Id.* (quoting *Provident Nat'l Bank v. California Fed. Savings Loan Ass'n,* 819 F.2d 434, 437 (3d Cir. 1987)). In accordance with the test set forth in *Southern Mach. Co. v. Mohasco*

12

*Indus., Inc.*, the plaintiff, first and foremost, must establish "purposeful availment" by demonstrating that the "defendant's contacts with the forum state 'proximately result from actions by the defendant *himself* that create a substantial connection with the forum State.'" *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1263 (6th Cir. 1996) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985) (emphasis in original)).

In pleading personal jurisdiction, conclusory allegations that lack a basis in specific facts are insufficient. *See, e.g.*, *American Copper & Brass, Inc. v. Mueller Europe, Ltd.*, 452 F. Supp. 2d 821, 828 (W.D. Tenn. 2006) (dismissal warranted where "Plaintiffs offer no specific facts in support of their conclusory statements that Defendant's parent company committed overt acts in furtherance of price-fixing within the state of Tennessee and that these acts are attributable to moving Defendants for jurisdictional purposes."). Moreover, in "the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).

The initial Complaint failed woefully to establish a basis for the exercise of personal jurisdiction over Clare, as it alleged contacts against the "Defendants" as an undifferentiated group without identifying any alleged contacts for Clare. The FAC (at ¶ 5) superficially identifies Clare in this context but still fails to offer more than conclusory allegations that track the legal standard for establishing long-arm jurisdiction without listing any specific acts that in fact occurred. As the accompanying Clare Declaration makes clear, that failure is more than a pleading error. Kenyon cannot allege activity by Clare sufficient to establish jurisdiction because there are no such acts. Moreover, the attempt to establish jurisdiction over Clare through shadowhunters.com must fail because that website is owned and operated by the Publisher. Accordingly, Kenyon's allegations

13

unwittingly demonstrate that even if the Trademark Claims had sufficient merit to survive a motion to dismiss (and they do not), Kenyon has asserted them against the wrong defendant.

The FAC acknowledges Clare that does not reside in Tennessee, that her books are produced, marketed and distributed by the third-party Publisher and that the movie and television series are similarly created, produced, marketed and distributed by third-parties. The allegations about purported "contracts with Tennessee vendors," "personal travel[] to Tennessee" and "direct promot[ion]" (FAC ¶ 5) are devoid of specific facts, and are therefore wholly insufficient to establish personal jurisdiction. *American Copper*, 452 F. Supp. 2d at 828.

In *Bridgeport Music, Inc. v. Still N The Water Publ'g.*, 327 F.3d 472, 480 (6th Cir. 2003), the Sixth Circuit held that granting a license with nationwide rights (of course, including Tennessee) coupled with a lack of objection to Tennessee sales, was insufficient to establish personal jurisdiction over the licensor. The Court distinguished its earlier opinion in *Tobin v. Astra Pharm. Prods., Inc.*, 993 F.2d 582 (6th Cir. 1993), as follows:

> In contrast to *Tobin*, NTW's contacts with Tennessee in the instant action lack the additional element present in *Tobin*, chiefly, the fact that the *Tobin* defendants were not merely aware that their distributor was likely to market the product in all fifty states; rather, the parties' contract required it.

Kenyon's allegation (at FAC ¶ 5) that the pertinent contracts "require CLARE's infringing works be sold or distributed in Tennessee" is an obvious attempt to bring the case within the ambit of *Tobin* rather than *Bridgeport*. However, as noted above (at p. 5), all of the contracts authorize, ***but none require***, distribution in every place covered by the grant of rights. In fact, none of them impose any marketing or distribution obligations whatsoever on the licensees. Because Kenyon's allegations are directly contradicted by the very contracts on which she bases those allegations, her allegation is meritless.

14

If Kenyon is suggesting that Clare is subject to jurisdiction merely because she authored works that are sold by others in Tennessee, she is mistaken as a matter of law, as demonstrated by the recent opinion in *Skidmore v. Led Zeppelin*, 106 F. Supp. 3d 581 (E.D. Pa. 2015). That case held that the individual members of Led Zeppelin (in particular, Jimmy Page, the creator of the song "Stairway to Heaven" that allegedly infringed the plaintiff's copyrighted work) were not subject to jurisdiction in Pennsylvania simply because the recordings of the song were widely available for purchase there. As a threshold matter, the Court correctly noted that, because copyright infringement claims are subject to a strict three-year statute of limitations, activity that occurred more than three years before the filing of the complaint is irrelevant. *Id.* at 587. Then, after engaging in the same due process analysis that a federal court in Tennessee does,[10] the Court held that such sales were not acts attributable to Page or the other band members:

> As to the fact that copies of "Stairway to Heaven" and Page's book are sold in stores located in the District, Plaintiff has failed to plead facts establishing that these sales are acts by the individual Defendants purposefully directed at the forum. Again, there is no evidence, and Plaintiff has not alleged, the individual Defendants have any control over where the song (or book) is distributed.

*Id.* at 588. "The analogous Tennessee limitations period for trademark violations under 15 U.S.C. §§ 1114 and 1125(c) is the three year period provided for actions for tortious injury to property." *Johnny's Fine Foods, Inc. v. Johnny's Inc.*, 286 F. Supp. 2d 876, 881 (M.D. Tenn. 2003) (citing Tenn. Code Ann. § 28–3–105). Clare has stated in her sworn Declaration that she neither visited nor had any purposeful contacts with Tennessee in the three years prior to February 5, 2016.

---

[10] Both Tennessee and Pennsylvania permit the exercise of jurisdiction to the full extent permitted by the Due Process Clause. *Compare Skidmore*, 106 F. Supp. at 585, *with Bridgeport Music*, 327 F.3d at 477 (citation omitted) ("As '[t]he Tennessee long-arm statute has been interpreted as coterminous with the limits on personal jurisdiction imposed by the due process clause,' we address only whether exercising personal jurisdiction over Appellees is consistent with federal due process requirements.").

15

**B.**     **To The Extent Personal Jurisdiction Exists, Plaintiff's Claims Fail To State Claims Upon Which Relief May Be Granted.**

  **1.**     *Plaintiff's Claims Must Be Dismissed Under Rule 12(b)(6).*

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). The complaint's factual allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although *Twombly* does not "require heightened fact pleading of specifics," a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. If the factual allegations do "not nudge [the pleaded] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* "Determining whether a complaint states a plausible claim for relief will . . . be *a context-specific task that requires the reviewing court to draw on its judicial experience and common sense*." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (emphasis added); *accord 16630 Southfield L.P. v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013).

To establish the "facial plausibility" required to "unlock the doors of discovery," the *plaintiff cannot rely on "legal conclusions" or "[threadbare] recitals of the elements* of a cause of action," but, instead, the plaintiff must plead **"*factual content*** that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (emphasis added). "In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are *no more than conclusions*, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they *must be supported by factual allegations*." *Id.* at 679 (emphasis added). As this Court has

16

explained, "The pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Patel v. Hughes*, No. 3:13-cv-0701, 2014 WL 4655285, at *1 (M.D. Tenn. Sept. 16, 2014) (Sharp, J.) (quoting *Iqbal*, 556 U.S. at 678 and *Twombly*, 550 U.S. at 555)).

The standard articulated in *Twombly* is not limited to any particular type of litigation, but rather governs the pleading standard "in all civil actions." *Id.* at 684. Further, to the extent Kenyon asserts that she should be entitled to take discovery to flesh out her claims, as she does here, the Supreme Court has explained that discovery is not a fair substitute for failing to state a claim. "It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through careful case management given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side." *Id.* at 685 (quoting *Twombly*, 550 U.S. at 559). The plaintiff must show a basis for relief, not merely assert a claim for it. *See, e.g., id.*

"[W]hen a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335-36 (6th Cir. 2007). Furthermore, if "the plaintiff does not directly refer to a document in the pleadings, but that document governs the plaintiff's rights and is necessarily incorporated by reference, then the motion need not be converted to one for summary judgment." *SFS Check, LLC v. First Bank of Del.*, 990 F. Supp. 2d 762, 774 (E.D. Mich. 2013) (citing *Weiner v. Klais & Co., Inc.,* 108 F.3d 86, 89 (6th Cir. 1997)).

## 2. *All of Kenyon's Lanham Act Claims Are Barred By Laches.*

As noted, the "analogous Tennessee limitations period for trademark violations under 15 U.S.C. §§ 1114 and 1125(c) is the three year period provided for actions for tortious injury to property." *Johnny's Fine Foods, Inc. v. Johnny's Inc.*, 286 F. Supp. 2d at 881. *See also CMH*

*Mfg., Inc. v. U.S. GreenFiber, LLC*, No. 3:12-273, 2013 WL 3324292, *3 (E.D. Tenn. Jul. 1, 2013) (citing *Audi AG v. D'Amato,* 469 F.3d 534, 545 (6th Cir. 2006)). ("Because the Lanham Act does not contain a statute of limitations, courts use the doctrine of laches to determine whether a Lanham Act claim should be barred."). With respect to Lanham Act claims, laches is a defense to claims for money damages. *Johnny's Fine Foods*, 286 F. Supp. 2d at 882 (citing *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 568-69 (6th Cir. 2000)). The necessary elements are unreasonable delay by the defendant and material prejudice to the defendant." *Id.* at 881.

"With respect to what amounts to an unreasonable delay, this Circuit holds faithfully to the principle that 'a suit will not be barred [by laches] before the analogous [three-year] statute [of limitations] has run but will be barred after the statutory time has run,' describing it as a presumption that 'should remain strong and uneroded in trademark cases.'" *Id*. (quoting *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 365-66 (6th Cir. 1985)). When the excessive delay is clear from the face of the complaint, dismissal under Rule 12(b)(6) is warranted. *CMH Mfg.*, 2013 WL 3324292 at *3-4.

Kenyon alleges that she learned in 2006 "from distressed fans" that a then-unpublished work by Clare used the term "darkhunter." (Complaint ¶ 12.) She next alleges that Clare substituted the term "shadowhunter" when that work was published in 2007 as *The Mortal Instruments: City of Bones*. She then acknowledges that she was aware of the continuous use of that term thereafter, but did not seek judicial relief to prevent it, even when the Publisher made its printing error in 2009. She therefore waited a full ***nine years*** after learning about Clare's use of "Shadowhunters" to bring this action. Under the authorities cited above, the Lanham Act claims are patently untimely as a matter of law.

In her FAC (¶¶ 18-19), Kenyon now says that while she was aware of the use of "Shadowhunter" since 2007, it was expanded into trademark use "only recently." Even if the

18

Court overlooks the deliberate use of the vague term "recent," her attempt to unilaterally vary the use of "Shadowhunter" as "trademark" or "non-trademark" when it suits her purpose is factually and legally untenable. "The essence of a trademark is a designation in the form of a distinguishing name, symbol or device which is used to identify a person's goods and distinguish them from the goods of another." *ETW Corp. v. Jireh Publ'g., Inc.* 322 F.3d 915, 921 (6th Cir. 2003). The FAC itself concedes that "Shadowhunters" has long served that function for Clare's works, just as "Dark-Hunter" allegedly serves that function for Kenyon's works. Consistent with than concession, the FAC defines all of Clare's books dating back to 2006 as the "Shadowhunter Series" and each individual book as a "Shadowhunters Book."

The FAC's allegations concerning the 2009 misprint incident further discredit the Kenyon's claim that using "Shadowhunters" as a branding term was "recent." The allegations concerning the 2009 misprint accuse Clare and the Publisher on numerous occasions of engaging in deliberate "misbranding" at that time. (*See, e.g.,* FAC ¶ 38 ("In 2009, following the misbranding, CLARE's 'store events' began to change.").) There is no dispute that the misprint was the substitution of "Darkhunters" on the back cover of the book where "Shadowhunters" had been and was supposed to continue being. Kenyon's arguments about the 2009 incident are therefore necessarily premised on the factual allegation that there was "misbranding," meaning the wrongful substitution of the "Shadowhunters" brand with the "Darkhunters" brand. This is a direct factual contradiction of allegation that Clare's allegedly infringing conduct is recent. "The ability to plead alternatively is not limitless." *Dorley v. South Fayette Twp. Sch. Dist.*, 129 F. Supp. 3d 220, 236 (W.D. Pa. 2015). "[W]here one factual assertion negates an essential element of a contrary assertion, that conflict cannot stand, absent sufficient explanation." *Id.* (citing *Cleveland v. Policy Mgt. Sys. Corp.,* 526 U.S. 795, 805–07 (1999)). Kenyon's assertion of only recent trademark use directly contradict her allegations of the "Shadowhunter Series" dating back to

19

2006 and of "misbranding" in 2009. Moreover, the record is clear concerning the use of "Shadowhunters" in the trademark or branding sense at least as early as 2007 and has been open, obvious, and continuous. (*See supra* at pp. 9-11.)

The FAC appears to seek to a lay a foundation for an argument that Kenyon's delay is excused by the doctrine of progressive encroachment. This argument, if made, would fail as a matter of law. As the Sixth Circuit emphasized in *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 570 (6th Cir. 2000), the doctrine applies when a junior user who has used its similar mark in a field different than of the senior user's moves directly into the latter's field. *See also Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 410-11 (6th Cir. 2002) (same). The two marks here compete in the same field of commerce: creative works with supernatural themes.

The prejudice that has accrued from Kenyon's multiyear delay is obvious. Since 2007, "Shadowhunters" has been used in at least 10 novels and other related books, the movie and the television series, all without any effort by Kenyon to prevent it prior to this year. The reliance by Clare and those working with her (*i.e.*, the Doe Defendants) "greatly increased [their] potential liability in a long-delayed trademark action and clearly amounts to prejudice to [them]." *Johnny's Fine Foods*, 286 F. Supp. 2d at 881. That prejudice, coupled with the indisputable delay, impels the application of laches to dismiss the claims.

**3.** ***There is No Confusion Between "Shadowhunters" and "Dark-Hunter."***[11]

There are at least three reasons that Kenyon's claim that "Shadowhunters" infringes "Dark-Hunters" should be dismissed as a matter of law. First*, as held in* General Motors Corp. v. Keystone Automotive Indus., Inc.*, 453 F.3d 351, 355 (6ᵗʰ Cir. 2006), "[t]here can be no likelihood of confusion at the point of sale where a defendant conspicuously and unequivocally informs buyers that the defendant, and not the plaintiff is the source of the product." *See also* Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) ("the prominent use of [a] well-known house brand therefore significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products.").[12] Kenyon admits that even the 2009 misprints had the correct author (Clare) and title (*City of Bones*). Thus, it is inconceivable that a would-be purchaser of one of Kenyon's "Dark-Hunter" books could purchase one of Clare's books by mistake, because such a purchaser **would see Clare's name displayed prominently on the cover of the book**. Kenyon's claim is unbelievable on its face, and certainly fails to reach even the level of implausibility. Accordingly, dismissal on that basis is warranted.[13]

---

[11] The Eighth Claim in Kenyon's initial Complaint (¶¶ 102-09) included a direct claim for trade dress infringement. The FAC has abandoned that Claim. Moreover, her conclusory allegations in the body of the Complaint (FAC ¶ 50) could not sustain a claim in any event.

> To allege that trade dress is protectable, "plaintiffs should detail 'exactly what the[ir] trade dress consists of.'" "Vague allegations that a defendant 'uses' protected trade dress are not enough." "A plaintiff must ... offer a precise expression of the character and scope of the claimed trade dress ... and articulate the 'elements of their product design with specificity to be afforded trade dress protection.'" "[I]t will not do to solely identify in litigation a combination as 'the trade dress.' Rather, the discrete elements which make up that combination should be separated out and identified in a list."

*Mike Vaughn Custom Sports, Inc. v. Piku*, 15 F. Supp. 3d 735, 745-46, (E.D. Mich 2014) (citations omitted) (dismissing complaint that failed to satisfy the stated requirements). The FAC does not come close to meeting the standard.

[12] Here, "Sherrilyn Kenyon" and "Cassandra Clare" serve as the "house brands," assuring buyers that they will be purchasing works by the respective authors, regardless of the title or any other branding information.

[13] The leading treatise on trademark law notes that "[s]ince the Supreme Court decisions in *Twombly* and *Iqbal* in 2007-2009, a growing number of courts have dismissed a trademark infringement complaint on a Rule 12(b)(6) motion when the allegations of a likelihood of confusion are implausible in view of the facts alleged." 6 McCARTHY

Second, Kenyon, as noted, is seeking a trademark monopoly not only for "Dark-Hunter" but for any word mark using "hunter" (at least in the field of supernatural creative works). "Dark-Hunter" is a compound mark, consisting of the elements "dark" and "hunter." The issue here is not whether she has any rights in the terms together but whether she can monopolize each separately. As a matter of law, she is not entitled to do so. Comment a to Section 14 of the RESTATEMENT (THIRD) OF UNFAIR COMPETITION acknowledges that a "designation consisting of a combination of elements may be inherently distinctive even if some or all of the individual elements are descriptive, but specifies that *"[r]ecognition of rights in the composite will not deprive competitors of access to the descriptive components.*" (Emphasis added). The first two dictionary definitions of "hunter" are "a person who hunts game or other wild animals for food or in sport" and "a person who searches for or seeks something." http://www.dictionary.com/browse/hunter. Standing alone and, in the absence of secondary meaning, cannot be protected. *Arkansas Trophy Hunters Ass'n v. Texas Trophy Hunters Ass'n, Ltd.*, 506 F. Supp. 2d 277, 281-82 (W.D. Ark. 2007). Kenyon alleges that "the Dark-Hunter Marks have acquired secondary meaning as an exclusive indicator of the creative authorship of the novels and associated products" (FAC ¶ 9), but makes no such allegation for "hunter" standing alone.

As noted above, there are more than 60 titles of audiovisual and literary works with supernatural themes alone, including the uses in unrelated works of *Darkhunters*, *The Dark Hunter* and *Shadowhunter*. (*See supra* at p. 9). This is hardly surprising, since so many involve people (or other creatures) "who search for or seeks something." Indeed, the very fact that the term is used so widely demonstrates that Kenyon cannot assert exclusive use of it. *Citizens Banking*

---

ON TRADEMARKS AND UNFAIR COMPETITION § 32:121:75 (4th ed.) (updated March 2016) (footnote citation omitted). Consistent with that statement, the Sixth Circuit has not hesitated to affirm the dismissal of a trademark claim when the allegations of likelihood of confusion were implausible. *Hensley Mfg., Inc. v. ProPride, Inc.*, 579 F.3d 603, 610-11 (6th Cir. 2009).

*Corp. v. Citizens Fin. Group, Inc.*, 320 Fed. Appx. 341, 347 (6th Cir. 2009) (widespread national use of a mark is "persuasive" evidence that the claimed mark is "weak").

Third and finally, dismissal is also warranted because the words "Shadowhunters" and "Dark-Hunters," as a matter of law, are not confusingly similar. In *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 796 (6th Cir. 2004), the Court held on summary judgment that "PowerZone" and "AutoZone" were not confusingly similar "particularly given the ubiquity of "ZONE." The cases upon which the Court relied are also instructive. *See Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571–72 (6th Cir. 1987) (LITTLE CAESARS and PIZZA CAESAR are dissimilar because "Caesar" is often used in selling Italian food and because of the differences in sound and appearance); *Streetwise Maps, Inc. v. VanDam, Inc.,* 159 F.3d 739 (2d Cir. 1998) (finding a dissimilarity between STREETWISE and STREETSMART when both were used to sell maps); *Gruner & Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d 1072, 1079–80 (2d Cir. 1993) (PARENTS magazine and PARENT'S DIGEST magazine not confusingly similar). In *ePrize, L.L.C. v. NetPrize, Inc.*, No. 06-14114, 2006 WL 3690921, *3-4 (E.D. Mich. Dec. 12, 2006), the Court, following *AutoZone* held that there was no infringement based on the common "use of 'prize,' which is a common word." Likewise, the common use of "hunter" here does not constitute trademark infringement.

### 4.     *Kenyon Fails to State a Claim For "False Advertising/Unfair Competition."*

The sole alleged factual basis for the Third Count in the FAC is the alleged infringement of the purportedly registered trademark "Dark-Hunters." (FAC ¶¶ 71-75.) There is no freestanding claim for "unfair competition" under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Rather, term is a shorthand for two distinct causes of action under the statute: false association (§ 1125(a)(1)(A)) and false advertising (§ 1125(a)(1)(B)). *See Lexmark Int'l, Inc. v. Static Control Components, Inc.* __ U.S. __, 134 S. Ct. 1377, 1384 (2014). Kenyon fails to comprehend the

distinction and improperly lumps them together. Equally important, it bases the § 43(a) claim on the same infringement of the same mark that is the basis of the infringement claims themselves. The Cause of Action clearly warrants dismissal based on this redundancy alone. *Ritchie Engineering Corp. v. Delta T. Corp.*, 2012 WL 1150844, *6 (D. Minn. Apr. 6, 2012); *Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.,* 154 F. Supp. 2d 586, 597 n.14 (S.D.N.Y. 2001).

**5.     *Kenyon Fails to State a Claim for Contributory Infringement.***

"[B]efore there can be liability for contributory trademark infringement, an underlying claim of direct infringement must first be established." *Tovey v. Nike, Inc.*, No. 1:12-cv-0448, 2012 WL 7017821, *10 (N.D. Ohio Jul. 3, 2013) (citing *Rosetta Stone Ltd v. Google, Inc.*, 676 F.3d 144, 163 (4th Cir. 2012)), *adopted and modified on other grounds*, 2013 WL 486341 (N.D. Ohio Feb. 6, 2013).  Because Kenyon's direct infringement claims are subject to dismissal, for the reasons stated above, her contributory infringement claim is as well.

There is no question that, at the very least, the Publisher and Constantin are necessary parties within the meaning of Fed. R. Civ. P. 19, which Kenyon, with full knowledge of their existence, has deliberately failed to join.  "A party is 'needed for just adjudication' under Rule 19 if: (1) complete relief cannot be given to existing parties in his absence; (2) disposition in his absence may impair his ability to protect his interest in the controversy; or (3) his absence would expose existing parties to substantial risk of double or inconsistent obligations." *Safeco Ins. Co. v. City of White House*, 36 F.3d 540, 546 (6th Cir. 1994).

One example makes clear why they are necessary. The FAC seeks a permanent injunction against the marketing, etc. "of any literary work, article of clothing, jewelry, video production, television broadcast, or motion picture in any format . . . or any related goods or services" that allegedly infringe her trademark. She further seeks the destruction of all such goods. As the contracts discussed at p. 5, *infra*, demonstrate, Clare lacks the authority to accomplish these

things. Thus, complete relief cannot be given in the absence of those parties, and there is a significant threat that Clare will face an injunction with which she could literally not comply.

**6.      *Kenyon Fails To State A Claim for Common Law Unfair Competition.***

"Tennessee's law of unfair competition differs from the federal law of unfair competition (*i.e.,* the Lanham Act § 43(a)) only in that Tennessee law requires a showing of 'actual confusion,' whereas the latter requires only a showing of a 'likelihood of confusion.'" *Moore v. Weinstein Co.*, No. 3:09-CV-0166, 2012 WL 1884758, *45 (M.D. Tenn. May 23, 2012) (quoting *Sovereign Order of St. John of Jerusalem, Inc. v. Grady*, 119 F.3d 1236, 1243 (6th Cir. 1997), *aff'd* 545 Fed. Appx. 405 (6th Cir. 2013)). There is a one-year statute of limitations on unfair competition claims under Tennessee law. *Johnny's Fine Foods*, 286 F. Supp. 2d at 881.

The FAC fails to allege actual confusion among consumers, referring instead only vaguely to "substantial consumer confusion" (FAC ¶ 37), a term that has no meaning in trademark law, and appears to be Kenyon's own creation. Even if it is assumed for the sake of argument that the 2009 e-mail cited at Paragraph 36 of the FAC is in instance of consumer confusion, that e-mail relates solely to the 2009 misprint of "Darkhunters," and not from any alleged confusion arising from the use of "Shadowhunters." Given the one-year statute of limitations for unfair competition claims, that Claim was time-barred no later than 2010.

## IV.      CONCLUSION

Based on the foregoing, Defendant respectfully requests that the Court dismiss the First Amended Complaint due to lack of personal jurisdiction over the Defendant and for failure to state a claim.

Respectfully submitted,

/s/ John R. Cahill
John R. Cahill (admitted *pro hac vice*)
Ronald W. Adelman (admitted *pro hac vice*)
**CAHILL PARTNERS** LLP
70 West 40th Street, 15th Floor
New York, New York 10018
Telephone: 212.719.4400
Facsimile: 212.719.4440
jcahill@cahilllawfirm.com
radelman@cahilllawfirm.com

Samuel. F. Miller (TN BPR No. 22936)
Maia T. Woodhouse (TN BPR No. 30438)
BAKER, DONELSON, BEARMAN, CALDWELL
& BERKOWITZ, P.C.
211 Commerce Street, Suite 800
Nashville, TN  37201
Telephone:  (615) 726-5594
Facsimile:  (615) 744-5594
Email:  smiller@bakerdonelson.com
Email:  mwoodhouse@bakerdonelson.com

*Counsel for Defendant Cassandra Clare*


## CERTIFICATE OF SERVICE

I certify that on June 22, 2016, I served a copy of this document, via the Court's CM/ECF system upon the following:

James E. Mackler, Esq.
William L. Campbell, Jr., Esq.
FROST BROWN TODD LLC
150 3rd Avenue South, Suite 1900
Nashville, TN 37201


/s/ Samuel F. Miller

26